VALLE & ASSOCIATES
JEFFREY B. VALLE  (Bar No. 110060)
    jvalle@valleassociates.com
STEVEN M. RAGONA  (Bar No. 181613)
    sragona@valleassociates.com
11911 San Vicente Blvd., Suite 324
Los Angeles, California 90049
Telephone:  (310) 476-0300
Facsimile:   (310) 476-0333

Attorneys for Defendant
STRADLING YOCCA CARLSON & RAUTH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STRADLING GLOBAL SOURCING, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>GARTNER, INC.,<br><br>    Defendant.<br><br>GARTNER, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>KEVIN PARIKH, et al.,<br><br>    Defendants. | Lead Case No.:<br>SA CV 07-37-PSG (MLGx)<br>Consolidated Case No.:<br>07-CV-2039 PSG (MLGx)<br><br>Assigned to Hon. Philip S. Gutierrez, Courtroom 790<br><br>**DECLARATION OF SHIVBIR GREWAL**<br><br>Filed in support of Defendant Stradling Yocca Carlson & Rauth's Motion for Summary Judgment<br><br>Date:  September 29, 2008<br>Time:  1:30 p.m.<br>Courtroom:  790 |

Declaration of Shivbir Grewal

I, SHIVBIR GREWAL, do hereby declare as follows:

1. I am a shareholder of Stradling Yocca Carlson & Rauth ("SYCR"), defendant in the above-entitled action. I submit this declaration in support of SYCR's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment. I have personal knowledge of the matters set forth herein and, if called as a witness, could and would testify competently thereto.

2. SYCR is an established California law firm with more than 100 attorneys in five offices in California. Its principal office is based in Newport Beach. SYCR services its clients in a wide variety of practice areas including, among others, corporate and securities, business litigation, IP and IP litigation, real property, corporate securities litigation, and municipal finance.

3. In 2006, SYCR was comprised of two distinct practice groups. Group A, to which I belong, focuses on such areas as general corporate practice, litigation, employee benefits and labor law. Group B's practice is generally in municipal finance and redevelopment. The shareholders and finances of the two groups in the firm are kept separate. Only Group A at SYCR had any involvement or interest in the sourcing practice, Stradling Global Sourcing, LLC ("Stradling Global"), at issue in this case.

4. I became acquainted with defendant Kevin Parikh through The Indus Entrepreneurs, a professional organization to which we both were members. In approximately the latter part of 2005 or the beginning of 2006, I discussed with Parikh his interest in leaving plaintiff Gartner, Inc., where he was then employed. At that time, we first discussed the possibility of SYCR and Parikh becoming associated in a sourcing practice in some fashion. SYCR represented a number of technology clients who used or could take advantage of outsourcing services.

5. Early in our discussions, Parikh indicated to me that he and three other of his associates, defendants Jay Priday, Robert Randolph and Mike Andersen, were

interested in leaving Gartner as a group and building a sourcing practice elsewhere. Parikh first met with certain other individuals at SYCR's offices in approximately early spring 2006 to generally discuss possibilities for a sourcing practice.

6. I am a member of SYCR's Executive Committee for the firm's Group A practice. During the pertinent period of 2006, there were four members of the Executive Committee – Bruce Feuchter, Craig Carlson, Michael Flynn and me. In or about the spring of 2006, the members of the Executive Committee began to explore the possibility of SYCR becoming involved with a sourcing practice operated by Parikh and the other three individuals who sought to leave Gartner. The other members of the Executive Committee asked me to be the point person to interact with Parikh, partly because of my prior association with him.

7. Throughout the spring and part of the summer, I, on behalf of the Executive Committee, explored the possibility of a sourcing practice with Parikh. It was not until approximately August of 2006 that the Executive Committee decided to begin internally to draft proposed terms for a possible sourcing business. Mr. Feuchter of the Executive Committee tasked Numan Siddiqi, an SYCR shareholder, to begin drafting a proposed Term Sheet. The initial drafts of the Term Sheet were only circulated internally within SYCR. In the early drafts, it was contemplated that SCYR would own 80% of the proposed sourcing business, with the other 20% owned by some combination of Parikh, and possibly Priday, Randolph and Andersen. The Executive Committee decided that it would not invest any significant start-up capital in the prospective sourcing business, but that SYCR would guarantee a line of credit to initially fund the proposed new venture.

8. During the process of exploring a possible sourcing venture with Parikh and the other three individuals, the Executive Committee tasked Robert Kane, a shareholder of SYCR who chaired the firm's labor and employment law practice, to advise the four Gartner employees as to their duties and obligations before and at the time of possibly terminating their employment with Gartner. The Executive Com-

mittee wanted to ensure, among other things, that the four individuals who might leave Gartner and start up a sourcing practice involving SYCR in some form, complied with their legal obligations on their exit from Gartner, thereby protecting SYCR's own interest.

9. When the proposed terms of the Term Sheet were presented to Parikh and the other three individuals, there was disagreement regarding some of the proposed terms for the sourcing enterprise. Among other things, Parikh expressed that he and the other three individuals felt SCYR's 80% ownership was too high. Members of the Executive Committee, on the other hand, expressed their opinion that Parikh and the other three individuals were not personally taking on any risk in the proposed new venture.

10. By mid-September, some members of the Executive Committee were contemplating having SYCR walk away from the proposed venture. For example, attached hereto as Exhibit "A" is a true and correct copy of an email chain in which, on or about September 14, 2006, Michael Flynn of the Executive Committee recommended walking away from any proposed transaction. I responded to Mr. Flynn's email the following day, asking that I be given an opportunity to discuss the outstanding issues with Parikh before the Executive Committee decided to abandon the proposed sourcing venture. The negotiating parties were not bound to enter into a venture, and were free to walk away at any time.

11. After further discussion with Parikh, I was able to accommodate a mutually agreeable proposed sourcing practice. Under the general proposed terms, SYCR would own 51% of a sourcing entity to be named Stradling Global sourcing, LLC, with the other 49% of owned by Parikh, Priday, Randolph and Andersen. It was understood that the four individuals would run the operations of Stradling Global.

12. It was only in approximately early October 2006 that the Executive Committee decided to take the Stradling Global proposal to a vote by the full part-

nership of the Group A shareholders at SYCR. According to the practice of SYCR, the firm could not become involved in a contemplated sourcing practice without a positive vote by the full Group A shareholders. If the Group A shareholders had voted against the proposed sourcing practice, SYCR would not have become involved in Stradling Global.

13. In my discussions with the Executive Committee in deciding whether to ultimately take the outsourcing venture to the Group A shareholders for a vote, we expected that Parikh would leave Gartner without taking with him any of the current contracts or ongoing projects that Gartner had with its customers. In one or more discussions that I had with Parikh, he indicated his belief that one or more of the clients that he worked with at Gartner might contact him after he had left Gartner. I had expressed that this was acceptable, but I and the other members of the Executive Committee understood that Parikh would not actively solicit former Gartner clients for whom had he provided services while at Gartner.

14. A presentation to the Group A shareholders about the proposed Stradling Global transaction occurred on or about October 19, 2006. The Group A partnership agreed, by a non-written vote, to proceed with the Stradling Global enterprise. I executed the Term Sheet on behalf of SYCR for the operations of Stradling Global to be effective as of October 27, 2006.

15. Stradling Global began operations on October 30, 2006. Prior to that time, and since that time, neither Parikh nor any of the other individuals leaving Gartner were authorized or expected by SCYR to act on its behalf. Moreover, at no time prior to formation of Stradling Global did SYCR have the ability to control Parikh or the other individuals leaving Gartner, nor did SYCR do so. SYCR has had

1 | minimal involvement in the operations of Stradling Global. SYCR receives periodic updates regarding the financial status of Stradling Global, including the outstanding amount on the line of credit.

I declare under penalty of perjury under the laws of the United States and the State of California, that the foregoing is true and correct.

Executed this 4 day of August, 2008, at Newport Beach, California.

_____
Shivbir Grewal

6

Declaration of Shivbir Grewal

**EXHIBIT A**

| | |
|---|---|
| From: | Grewal, Shivbir |
| Sent: | Friday, September 15, 2006 6:04 AM |
| To: | Flynn, Michael E.; Siddiqi, Numan; Carlson, C. Craig; Feuchter, Bruce W. |
| Subject: | Re: Sourcing |
| Sensitivity: | Confidential |

I would like to have a discussion with Kevin on my return before we decide on walking away. We have spent a while on this and sometimes negotiations tend to get heated and people say things in the heat of the momemt which they may not really mean.   Regards, Shiv


-----Original Message-----
From: Flynn, Michael E. <MFLYNN@SYCR.com>
To: Siddiqi, Numan <NSIDDIQI@SYCR.com>; Carlson, C. Craig <CCARLSON@SYCR.com>; Feuchter, Bruce W. <FEUCHTER@SYCR.com>; Grewal, Shivbir <SGrewal@SYCR.com>
Sent: Thu Sep 14 18:12:21 2006
Subject: Re: Sourcing

Wow.  Very well put Numan.  Guys, I just don't think this will work out as I sense way too much philosophical differences and future conflict.  I vote that we terminate discussions and wish them well at Deloitte.  Mike

-----Original Message-----
From: Siddiqi, Numan <NSIDDIQI@SYCR.com>
To: Carlson, C. Craig <CCARLSON@SYCR.com>; Feuchter, Bruce W. <FEUCHTER@SYCR.com>; Flynn, Michael E. <MFLYNN@SYCR.com>; Grewal, Shivbir <SGrewal@SYCR.com>
CC: Grewal, Shivbir <SGrewal@SYCR.com>
Sent: Thu Sep 14 15:28:10 2006
Subject: Sourcing

Gentlemen,

First of all, I want to thank each of you for your input today (I spoke briefly with Craig, had a meeting with Bruce, and a detailed email from Mike).

Also, as I expected I would, I got a call from Kevin this afternoon (right after speaking to Bruce). He chewed my ear for almost 2 hours. I told him that I've relayed his concerns and comments to each of you and in all likelihood he will hear back from Shiv within a few days.

Based on my conversion with Kevin and Ravi last night, your responses, and now my latest discussion with Kevin, here's what I think we could propose to get us to the finish line (if that's ultimately what we want to do):

1)   We agree to their request for initial full salaries without any initial hold-back, but require a hold-back to go into effect within 120 days if there isn't a certain amount of revenue generated by then. (Ideally we would suggest the reverse, that they would start with a cut-back and get up to the full salary upon a threshold revenue, but this would requier more negotiation with Kevin. It's troubling (in many respects) how beholden these guys are to their day one salary, nothing else really matters to them). We should also propose to provide for proportionate cut-back in 2008 if there is then more than $500,000 outstanding under the line of credit and (as we had it before) in 2009 if there is any outstanding slance left on the line of credit.

460

CONFIDENTIAL

SYCR02589

7

2)   We agree to take our preferred return after their bonuses but insist that debt service be satisfied first. In other words, we leave debt service as the second priority (after operational expenses), and agree to have their bonuses as third and our preferred return as fourth.

3)   We agree to withdraw our proposal that a terminating employee pay 25% of gross revenue for 5 years relating to any client engaged within 2 years of termination, but leave in (and bolster) the other two penalties upon voluntary termination: Upon termination, the terminating employee becomes (i) jointly and severally liable with SYCR under the line of credit up to the amount then drawn by the Company under the line to pay the terminating employees total compensation plus fees under the Management Agreement, and (ii) obligated to reimburse the Company and/or SYCR for any amounts expended in defense of claims made by the existing employer, and (iii) obligated to pay the Company $100,000 in cash over 12 months as liquidated damages to compensate the Company in connection with having to reconstitute the Management Agreement structure. Kevin also seemed open to us putting whatever other provisions we can think of to incentivize them to stay. So we should give this more thought.

The first point here (re base salary draws) remains the biggest issue, both from an economic standpoint (because it would require us to get a bigger line of credit; we would need an extra $550K between 10/06 and 12/07) and as a philosophical disconnect, as you have both aptly noted. The other two points I think we can deal with.

But there are also remain some other areas of philosophical disconnect here, which Kevin and Ravi kept raising yesterday and Kevin raised again and again today. They offer insight into Kevin's thinking:

1)   They question the "fairness" of our proposed "VC" investment, where we aren't putting in any cash, getting our loan paid back and still want an 80% interest and a preferred return. Ravi said, "I've seen lots of standard VC investments and this is ridiculous." He said, "you are not putting in any money; a true VC invests its money and takes the risk that it might lose it. You aren't investing money and you don't want to take any risk." Ravi also said, "This is why I initially didn't want to deal with a law firm; you are lawyers, not businessmen, you don't want to take any risk." Kevin said this again today.

I told him that if he has concerns about the overall structure of this deal, then I'm not sure how we got to the current term sheet stage, because I understood the 80/20 split with a line of credit guaranty to be the deal from the start. I told them that if they instead want a standard VC deal, they should let us know and then perhaps they should go ahead and form their company with some seed capital, deal with Gartner on their own, hire their team, lease their offices, get a pipeline of business going, and then send us a PPM and we'll look at it. I also told them that they could rest assured that as a "standard" VC investor and as "businessmen", we wouldn't expect our money to fund $300K salaries for a start-up with no revenue, no clients, and a group of employees with no interest in equity and the prospects of litigation looming over their heads. They accepted my response; Kevin in particular. But they still keep coming back to this theme.

So I think we should keep this in mind. They will come back to this argument again, expressly and directly or not. And it suggests that they do not appreciate the value of our investment, where we are essentially taking away all the risks and uncertainties associated with a start-up venture by guaranteeing their full salaries, offering them an office and full infrastructure, giving them our name and reputation and agreeing to handle their potential litigation. They instead see themselves as an emerging growth company ready for VC financing and our imposing on them above-market VC terms. As such, although we can get to a resolution and get started, we have the risk of this deal being perceived by our partners as too rich and by Kevin's team as a rip-off (a real "lose-lose" situation). There could be conflicts in the future, especially if things don't go exactly as planned and projected and one of these

461

CONFIDENTIAL

SYCR02590

8

guys gets confronted by one of our partners in the hall. These guys are simply not going to be sympathetic to or impressed by concerns raised by us "lawyers" about the risks we are taking here. If we have to make good on our guaranty, our partners are going to see this as a disaster; Kevin is going to shrug and see it as us simply doing the right thing and paying for our 80% investment and remind us that Deloitte was willing to pay him $5M cash.

2)  Kevin has continued to stress the importance of him having "flexibility" to run the business. I think he had (and may still have) the impression that we're going to let him have free reign over this business. He has figured that by our size and the nature of our practice, we simply won't have the time or ability to micro-manage him. I think he expects, notwithstanding the control and rights we have set out for ourselves in the term sheet (which he didn't dispute), that this will be a passive investment for us. At the least, he believes our involvement, as attorneys for his clients or otherwise, will be at his direction and control. He may be right about all this, but his attitude suggests to me that if we do assert ourselves into his business, he is going to react negatively to it, and will say, "I could have just gone to Deloitte if I wanted to deal with all this."

I think that, therefore, we need to have a much better understanding of what he plans to do over the next year or so. Maybe you all have already done this. The impression I got from him is that he has plans to spend money beyond just salaries and bonuses. We should know about these things now so we aren't faced with having to say no to him later.

Thanks,
Numan