1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

4   GARNTER, INC.                      )
                                       )
5                                      )
                                       )
6                                      )
                         Plaintiff,    )
7                                      )
                                       )
8                                      )   No. CV07-2039-PSG
             Vs.                       )
9                                      )
                                       )
10  KEVIN PARIKH, ET AL.,              )
11                                     )
                                       )
12                                     )
                        Defendants.    )
13                                     )
    _____

14

15

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17            *Summary Judgement Motions*

18             LOS ANGELES, CALIFORNIA

19            MONDAY, OCTOBER 6, 2008

20  _____

21

22          MIRIAM V. BAIRD, CSR 11893
         OFFICIAL U.S. DISTRICT COURT REPORTER
23         255 EAST TEMPLE STREET, # 181-K
            LOS ANGELES, CALIFORNIA 90012
24              (213) 894-2853
             MVB11893@aol.com
25

1              **A P P E A R A N C E S**

2

3   **IN BEHALF OF THE PLAINTIFF,**      GAIMS, WEIL, WEST & EPSTEIN
    **GARTNER:**                          BY:  ALAN JAY WEIL
4                                         - AND -
                                          MARC EPSTEIN
5                                         1875 CENTURY PARK EAST
                                          TWELFTH FLOOR
6                                         LOS ANGELES, CALIFORNIA
                                          90067
7

8

9

10

11  **IN BEHALF OF THE DEFENDANT,**      JACKSON LEWIS
    **KEVIN PARIKH, ET AL.:**            BY:  THOMAS G. MACKEY
12                                        - AND -
                                          JAMIE CHANIN
13                                        725 SOUTH FIGUEROA STREET
                                          SUITE 2500
14                                        LOS ANGELES, CALIFORNIA

15

16  **IN BEHALF OF THE DEFENDANT,**      VALLE & ASSOCIATES
    **STRADLING YOCCA:**                 BY:  JEFFREY B. VALLE
17                                        - AND -
                                          ILAN WISNIA
18                                        11911 SAN VICENTE BOULEVARD
                                          SUITE 324
19                                        LOS ANGELES, CALIFORNIA
                                          90049
20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1          LOS ANGELES, CALIFORNIA; MONDAY, OCTOBER 6, 2007; 1430

2                                   ---

3

4          THE CLERK:  Calling Civil case 07-2039, Gartner,

5    Inc., vs. Kevin Parikh, et al.

6          Counsel, please state your appearance for the

7    record.

8          MR. WEIL:  Good afternoon, Your Honor.  Alan Weil

9    and Marc Epstein for plaintiff Gartner.

10          THE COURT:  Good afternoon.

11          MR. MACKEY:  Good afternoon, Your Honor.

12    Thomas Mackey, Robert Fischer, and Jamie Chanin for all

13    defendants other than Stradling Yocca --

14          MR. VALLE:  Good afternoon, Your Honor.

15    Jeffrey Valle and Ilan Wisnia for defendant Stradling Yocca.

16          THE COURT:  Three motions before the Court.  I'm

17    only going to entertain argument as it relates to the two

18    summary judgment motions.  The motion for terminating

19    sanctions will be submitted without argument.

20          First, I want to talk about the summary judgement

21    motion brought by the -- what I'll categorize as the

22    individual defendants.

23          You may be heard.

24          MR. MACKEY:  I believe that our papers, both the

25    moving papers and reply to the opposition, adequately address

1    the issues both that we have raised and that are raised by

2    the opposing parties.  If Your Honor has particular questions

3    of areas of interest, I would be happy to address those.

4         I would also like to point out this is a motion

5    that is brought by a number of defendants and do want to make

6    sure that we get individualized rulings with regard to

7    particular defendants.

8         THE COURT:  I intend to do that.

9         One specific question I had, it relates to the

10   tenth cause of action, the breach of fiduciary relationship.

11   There's an argument being made.  There are officers and there

12   are nominal officers.  Can you elaborate on that point for

13   me, and it didn't seem that there was any case law on it

14   either way.

15        MR. MACKEY:  Well, it is undisputed that

16   Mr. Parikh, who is the only defendant in this cause of action

17   for breach of fiduciary duty, was not an officer elected by

18   the board of directors.  That is a significant distinction in

19   that all of the case law from Bancroft Whitney to GAB

20   Business Services and on down address the concept of an

21   officer who has been elected by the board of directors.

22        This concept of nominal officer is the step that

23   you take after you have already found somebody who is elected

24   by the board of directors.  That concept is, okay, so you

25   were elected by the board of directors and so you're an

1    officer, is that just a name only, and you're really just the

2    janitor, or do you really have input into business decisions.

3            THE COURT:  Are you one of 500 vice presidents with

4    the key?

5            MR. MACKEY:  Exactly.

6            By the way, in the professional services arena,

7    there do tend to be an extraordinary number of vice

8    presidents, almost none of which have powers truly vested in

9    them by the board of directors of the respective corporate

10   entities.

11           THE COURT:  All right.

12           MR. MACKEY:  As we point out in our reply brief,

13   plaintiffs can point to no case in the State of California

14   that actually finds a fiduciary duty where you have someone

15   who is not first elected by the board of directors and

16   appointed as an officer.

17           THE COURT:  Thank you.

18           With regard to this particular motion, Mr. Weil and

19   Mr. Epstein, I really have -- I looked at everything.  I want

20   to go back and look at it again.  There was just so much, but

21   I think I have a pretty good understanding.

22           With regard to the second cause of action, which is

23   the breach of confidentiality and the non-disclosure

24   agreement, in the moving papers a point is made that I'd like

25   to talk to you briefly about.  That is, that relates to the

```
 1    A.O.C. fact sheet, whatever --

 2              MR. WEIL:  The fuse spreadsheet, Your Honor.

 3              THE COURT:  It relates to the A.O.C.

 4              MR. WEIL:  Yes.

 5              THE COURT:  Now, how is it a breach of

 6    confidentiality if the defendant takes that document, and as

 7    I understand it, there's no other evidence other than he

 8    presents it to the plaintiff in discussions of, I guess, a

 9    future subcontract with the A.O.C.?  Can you have a breach of

10    confidentiality where the only potential breach is that the

11    defendant has the confidential document, and then the only

12    evidence of use is basically, presenting it back to the

13    plaintiff?

14              MR. WEIL:  Yes, Your Honor.  The reason why and the

15    thing that is ignored in their papers when the defendants say

16    that defendant Priday did not disclose a fused spreadsheet to

17    others is that they exclude from that Stradling Global

18    Sourcing.  Mr. Priday disclosed the fuse spreadsheet.  The

19    information that it contains that is embedded within it which

20    is a Gartner trade secret to a competitor, and used it not

21    for Gartner's benefit, as he was required to do under his

22    employment agreement.  He used it for the benefit of the new

23    competitor, Stradling Global Sourcing.

24              So if he were only using it for the purposes

25    described in his employment agreement, we'd have no quarrel,
```

1    but he's not using it for that purpose.  This is the language

2    in his employment agreement.  It says that he will not,

3    quote, "use or disclose the confidential information other

4              than solely in the furtherance of Gartner's

5              business, and will deliver to Gartner all of

6              Gartner's property and confidential materials upon

7              the termination of his employment."

8              He didn't do that.  He did not take it for any

9    purpose other than to feather the nest of a competitor.  That

10   is a clear breach of the agreement.

11             There is another document that he contributed to

12   creating and passing on to both Stradling Yocca and

13   subsequently, Stradling Global, which is also a breach of his

14   confidentiality obligations.  One of the documents we

15   submitted under seal, Exhibit 209, which is an engagement

16   transition prospects report.  That was submitted by defendant

17   Parikh to Stradling Yocca while these defendants were still

18   employed at Gartner.

19             Mr. Priday contributed to the preparation of that

20   document.  And Mr. Parikh is acting for the benefit of

21   defendants Priday, Anderson, and Randolph and submitting that

22   and other trade secret documents to Stradling Yocca while

23   they were still employed.  That document, like the fuse

24   spreadsheet, comes from Gartner's Engagement Management

25   System.  The acronym for which is GEMS.  It is aptly named.

1          That is the mother load.  That contains all of the

2     confidential password-protected information and data that

3     Gartner has amassed through the expenditures of hundreds of

4     thousands if not millions of dollars.  That is how they

5     extracted this information and gave it to Stradling Yocca and

6     Stradling Global for the purpose of competing against

7     Gartner.

8          Now, that information could not have been disclosed

9     to a competitor or a potential competitor or anyone outside

10    of Gartner, and yet it was.  It is the short answer and what

11    is ignored by the motion papers.

12          THE COURT:  All right.

13          I wanted to back up to the moving party.  I

14    neglected to ask one other issue that I wanted to talk about.

15    Mr. Weil, you can respond to it.

16          This related to the third cause of action, the

17    breach of non-solicitation.

18          MR. MACKEY:  Yes.

19          THE COURT:  When you read *Edwards*, I don't think

20    *Edwards* is helpful.  Footnote Number 4 says we're not looking

21    at this issue.  If you go back to Lorall, (phonetic) doesn't

22    Lorall support the enforcement of such a provision?  Lorall

23    is back in 1985.  A lot of time has passed since 1985.  You

24    look at the Metro case that has been cited.  Why shouldn't

25    the Court follow Lorall and say, if that's all we have that

1    is specifically on point, and that portion of the agreement

2    is enforceable because *Edwards* doesn't tell us anything about

3    it?

4             MR. MACKEY:  There is two reasons.  One, is that

5    Lorall is not really couched in dealing with the statutory

6    language of Section 16600 and its applicability.

7             The second reason, which is more important, is that

8    there is a case that is exactly on point.  That is the

9    *Infocrossing vs. Strategics* decision.  It is true that

10   decision was addressing a contract as between buyers and

11   sellers of businesses, i.e. competitors with one another.

12   However, under Section 16600, there is no meaningful

13   distinction whatsoever.

14            In *Infocrossing*, the Court specifically addressed

15   an agreement which restricted the ability to recruit and hire

16   employees, as well as clients.  The Court specifically said

17   that you must -- if you're going to find that such an

18   agreement survives Section 16600, that there must be some

19   sort of specific statutory exception.  And in that case, the

20   exception that was addressed was the Section 16601 provision

21   dealing with sale of business and the goodwill related

22   thereto.

23            That dove-tails perfectly of what was decided in

24   the *Edwards* decision which mirrors and echos *Infocrossing*

25   that when it comes to Section 16600, absent an expressed

1    statutory exception that fits, then there can be no provision

2    restricting either solicitation of employees or solicitation

3    of customers.

4           So *Infocrossing* is actually a much more on point

5    and direct discussion of the issue.  If you read Lorall

6    carefully -- and I've done this -- I actually find that

7    holding to be slight dicta as opposed to a clear holding.  It

8    may be a matter of degree.  What we do know now is that we

9    have a very strong pronouncement from the High Court in

10   *Edwards* regarding the essential requirement that there be a

11   specific statutory exception.  And we have that dove-tailing

12   almost perfectly with the *infocrossing* decision which says

13   the exact same thing in the context of non-recruitment

14   provisions.

15          THE COURT:  The last question relates to the -- the

16   fifth cause of action, the tortious interference with

17   contract.  I became very confused.  It was clarified for me

18   because Stradling Yocca's papers made a point that you didn't

19   make.  When I looked at the first amended complaint, that

20   cause of action only talks about interference with clients,

21   not employees.

22          In the Stradling opposition motion, they make that

23   point and say, don't even talk about employees; it's never

24   been pled.  We don't have any discovery about it.  This is

25   just about interference with clients.

1           What is your position on that point?

2           MR. MACKEY:  That the first amended complaint is

3    what it says.  With respect to the allegations it focuses on

4    clients, then that's what we address.  That is why in our

5    motion we did focus the interference claims with regard to

6    the evidence they proffered relating to clients as opposed to

7    employees.

8           THE COURT:  Thank you.

9           MR. MACKEY:  At some point I would like to respond

10   to some of the comments Mr. Weil made, but I will wait my

11   turn.

12          THE COURT:  Mr. Weil, if you would address those

13   points.  If at the end there is something else you want to

14   point out briefly, that would be fine.

15          MR. WEIL:  Yes, Your Honor.

16          With respect to the Court's question as to whether

17   Lorall endorses the non-recruitment provision in Gartner's

18   contract, I think the answer is yes.  It is the only case

19   directly on point.  It's not questioned or mentioned in the

20   case or cases that Mr. Mackey just cited the Court to.  It's

21   not mentioned in the *Strategics* case.  It is not mentioned in

22   *Edwards*.  The issue that was addressed in Lorall is really

23   not present in *Strategics* or *Edwards* at all.

24          *Strategics* is dealing with the sale of a business

25   under Business and Professions Code Section 16601, not 16600.

1    What the Court says there is that it's okay to have a

2    covenant that restricts raiding or recruitment of the

3    seller's business.  In other words, if I sell my business to

4    Mr. Mackey, I can have a covenant that says I cannot then go

5    to Mr. Mackey and raid the employees that I've just given to

6    him by the sale of my business, but I can have a provision

7    which prevents me from recruiting employees that he already

8    had.  That's what the Court in *Strategics* said.

9         You can have a valid non-recruitment provision that

10   prevents the seller from recruiting back those that he's

11   already sold as part of his business, but it's overbroad.  If

12   you try to restrict the seller's recruiting activities to

13   those that are not in any way involved in the sale of his

14   business.

15        *Strategics* never dealt with the issue raised in

16   Lorall.  In Lorall what you had was a clear unmistakable

17   breach of a non-recruitment provision.  What Lorall says is

18   that such a provision doesn't even implicate Business and

19   Professions Code 16600 because it doesn't restrict

20   competition.  There's been no reported decision which has

21   ever questioned Lorall since it was published.

22        With respect to *Edwards*, *Edwards* doesn't mention in

23   any way this issue of recruitment.

24        THE COURT:  It doesn't say -- it just not going to

25   talk about it.  It says, basically, we're not going to

 1    address that issue.

 2              MR. WEIL:  Correct.

 3              So what you first have to get to before you could

 4    ever get to the recruitment issue, is you have to reverse

 5    Lorall's statement that a non-recruitment provision is

 6    somehow not even within 16600 at all.  Then you have to

 7    decide whether or not it's a restricted covenant in violation

 8    of 16600.  Lorall is directly on point on both of those

 9    issues.

10              One of the other points that was just addressed was

11    with respect to the fifth cause of action with respect to the

12    tortious interference claim.  If I understand the Court's

13    question, was whether there is something that has been pled

14    with respect to tortious interference with both the

15    employees' contracts and with customer contract?

16              THE COURT:  Exactly.

17              MR. WEIL:  In the complaint, we allege the tortious

18    interference as notice pleading is required.  In answers to

19    interrogatories, which Stradling Yocca does not dispute we

20    give them, we said that there were two kinds of tortious

21    interference, two kinds of contracts interfered with.  We

22    said the client contracts.  We also said the employment

23    contracts.

24              We did not make that point with respect to

25    Mr. Mackey's clients.  We're not contending that any

1    particular employee could interfere with his own contract,

2    but Stradling Yocca could and did.  So we put them on notice

3    in discovery that they were interfering with that part of the

4    employment agreements that Gartner had with its own

5    employees, which is not terminable at will.  That's the

6    portion that says, thou shall not disclose trade secrets and

7    other confidential information.

8            By encouraging and conspiring with the four V.P.

9    defendants to obtain and use Gartner's trade secret

10   information, you have tortious interference with existing,

11   binding contractual provisions, which are not at will.  It's

12   Stradling Yocca's argument that we're dealing with there that

13   we have to show some independent wrong.  We don't have to

14   show an independent wrong with respect to those agreements.

15           With respect to the clients Mr. Mackey represents,

16   we have shown that independent wrong.  The independent wrong

17   with respect to Gartner's clients is the repeated, incessant

18   disclosure and use of Gartner's trade secret information over

19   an eight-month period while they were full-time employees of

20   Gartner.

21           I would like to spend -- does that answer

22   Your Honor's questions about the difference there?

23           THE COURT:  Yes.

24           MR. WEIL:  I would like to spend a few minutes

25   talking about the other claims in the complaint and answering

1    the question about the breach of the duty of loyalty claims.

2         The Court said, as I understand it, that there was

3    some question as to whether there can be a breach of a duty

4    of loyalty for a non-officer.  Mr. Mackey says, no.

5         We've cited the case of -- I am going to

6    mispronounce it -- Huang Kue.  (Phonetic)  I believe that's

7    the pronounciation.  That is a case which held directly that

8    non-officers, someone who has not been elected by the board

9    of directors of a company, has a duty of loyalty.  Indeed,

10   that duty of loyalty is fiduciary in nature.

11        The language of the opinion is explicit.  The Court

12   expressly rejected -- This is a 2007 case.  The Court

13   expressly rejected the defendant's assertion that only

14   officers owe a duty of loyalty.  This is what the Court said,

15   nor are defendants aided by the suggestion that they were

16   non-executive employees.  The Court held that the duty of

17   loyalty arises simply from the principal/agent relationship

18   that exists when you have an employer and an employee.

19        The defendants in that case, they sold their

20   business, and the persons who sold the business, the

21   defendants, agreed to manage the business for four years.

22   During that four-year period, they then secretly engaged and

23   participated in discussions with a third party to form a

24   competing business.

25        The Court held that the plaintiff had a right to

1   expect the undivided loyalty of these non-officers who have

2   been brought in to engage in management, and that they had

3   violated their duty of loyalty and a fiduciary duty of

4   loyalty by disclosing trade secrets to a third party.  This

5   is the language of the Court.

6           The Court held that the employer was entitled --

7           THE COURT:  When you're reading, slow down.

8           MR. WEIL:  I'm sorry.

9           THE COURT:  Thank you.

10          MR. WEIL:  The Court held that the employer was

11  entitled to consider the duty of loyalty, an integral part of

12  the principal/agency relationship, just as a buyer expects an

13  automobile to come with tires.

14          It is such a clear proposition that a non-executive

15  employee owes a duty of loyalty to the employer that it

16  should be without question the case.

17          Your clerks are not officers elected by a board of

18  directors, but if they take confidential memorandum of the

19  Court and disclose them outside your chambers without your

20  knowledge of consent, they breached the duty of loyalty to

21  the Court.  That is true of every employee.  It doesn't make

22  any difference who they are.

23          THE COURT:  That's an interesting point.  I never

24  thought of a remedy against a former law clerk, other than

25  their careers being over, as we knew it.  If that happened, I

1    haven't -- I never thought whether or not the -- it's

2    probably a bad example, but whether the Court would have some

3    type of an independent right against the law clerks for the

4    disclosure of confidential information.  Now that I think

5    about it, people have written unauthorized books.

6              In any event, I understand your point.

7              MR. WEIL:  I think that says more about the

8    reluctance of the judiciary to sue, knowing what it knows

9    about litigation, than it does about whether there is a

10   proper cause of action for that conduct.  I'm using --

11             THE COURT:  I understand.

12             MR. WEIL:  I'm using it just as an example.

13             It doesn't make any difference who the employee is.

14   The question is what is the conduct that we're talking about.

15   We're not talking here about something that is trivial, even

16   though the defendants attempt to trivialize it.  We're

17   talking about the repeated disclosure of what is most

18   important to Gartner.  Information that it collects and

19   protects on a confidential database.  It wasn't done once.

20   It wasn't done by accident.  It was done for the purpose of

21   competing unfairly with Gartner.

22             The same case held that the duty of loyalty is a

23   fiduciary one.  This is, again, the language of the Court in

24   that case.  Where such a relationship exists, meaning the

25   principal/relationship of employer and employee, the agent

1   assumes a fiduciary duty to act loyally for the principal's

2   benefit in all matters connected with the agency

3   relationship.  Then the Court went on to hold that what they

4   did breached their duty of loyalty.  We have those

5   circumstances in spades.

6       Let me also say a word about what Mr. Parikh's

7   management responsibilities were.  Even if it were the case

8   that you had to show that the defendant had management

9   responsibilities above that of a clerical employee, which is

10  obviously the case here, we did that as well.  It's all

11  unrebutted.

12      In addition to being -- the title of vice president

13  may not have been bestowed upon him by the board of

14  directors, but it was bestowed upon him by the senior

15  management of the company.  It represented a particular

16  position of discretionary management authority.

17      In fact, Parikh himself describes himself on

18  Stradling Global's website as having led the global sourcing

19  practice for Gartner consulting.  He was responsible for

20  business development planning at Gartner.  He was responsible

21  for personnel decisions regarding the sourcing practice,

22  including interviewing, hiring, firing, and performance

23  reviews.  He was the engagement manager on many Gartner

24  projects, which meant he supervised all of those on the team

25  whom he also recruited to the competitor Stradling Global

1      Sourcing.  So he was in a unique position at Gartner.  It's

2      true it's a big company.  There are others who have

3      significant positions of responsibility, but you cannot

4      trivialize the role that Mr. Parikh held there.

5              They say in reply that Mr. Parikh breached no duty

6      to Gartner, even if he had such a duty, but that completely

7      ignores the trade secrets which he repeatedly disclosed while

8      he was still employed by Gartner full time.

9              They also say that all he did was to prepare to

10     compete.  Not so.  We've cited the Bancroft Whitney case for

11     the proposition that -- first of all, whether someone --

12     whatever they're doing, is preparing to compete is always a

13     question of fact.  In this case, though, it can't be disputed

14     that disclosing trade secrets to Stradling Yocca and then to

15     Stradling Global is not preparing to compete.  That is a tort

16     in and of itself.  In Bancroft Whitney the Court so held.

17             It also cited the restatement of agency with

18     approval, which has been cited by many courts in California

19     and elsewhere, for the proposition that although any one

20     individually who is at will can leave whenever he wants to,

21     you cannot agree, conspire, and encourage each other to leave

22     together without notice simultaneously for the purpose of

23     harming your employer, which is what they did here.

24             We submitted to the Court the e-mails that we were

25     able to obtain, those that had not been spoliated.  They make

1    it clear that these defendants agreed amongst themselves that

2    they had to leave without notice on the same day at the same

3    time, because if they didn't do that, Gartner would have a

4    real opportunity to restaff the engagements and keep their

5    clients.

6            They did it not simply to feather their own nest,

7    but to harm Gartner at the same time.  They were successful

8    at it.  The strategy actually worked because they had a

9    two-step process.  They were instructed by Stradling Yocca

10   not to take too many when they first left.  So when they

11   first left, only the four V.P. defendants leave without

12   notice and all at the same time.  They know that Gartner has

13   got to restaff and got to do it quickly.  Who are they going

14   to look to restaff?  They're going to look to the other

15   members of the team, defendants Mahalingam, Singh, and Guapo.

16           So when Gartner attempts to restaff informing its

17   clients that we can do this work for you with the rest of the

18   team, the rug is pulled out from under them, because they

19   then give notice and leave.  So Gartner is deprived of the

20   very people it would have used to restaff the engagement.

21   This was a very sophisticated and well-planned effort over an

22   eight-month period to steal a complete turn-key sourcing

23   practice from Gartner through the theft of their trade

24   secrets.

25           Just as in Bancroft Whitney, there is substantial

```
 1    evidence of at least four ways in which Parikh breached his
 2    duty of loyalty and went far beyond preparing to compete.
 3    Misappropriating the trade secrets, encouraging the other
 4    defendants to leave with him without notice, recruiting
 5    co-employees in violation of the provisions in their
 6    agreements, and essentially, building a competitor on
 7    Gartner's dime while he's still working full time for
 8    Gartner, creating marketing materials, press releases, a
 9    website, draft proposals to Gartner's own clients to be used
10    at the competitor's business.
11             THE COURT:  All right.
12             MR. WEIL:  I want to say a word about two of the
13    other claims that we have.  The unfair business practice
14    claims, which are alleged against all of the defendants.
15    It's important, I think, to keep in mind that, as you see all
16    of the time in criminal cases -- when I was a Federal
17    prosecutor, one of the things that always comes up is that
18    you never see the entire contours of the conspiracy because
19    it's not the kind of thing that the conspirators talk about
20    openly.
21             We're fortunate that we were able to obtain through
22    a forensic computer expert and discovery some evidence of
23    what this entire process looked like.  We think for purposes
24    of summary judgment, the Court has to look at the totality of
25    the circumstances and see what they did.  Under the Unfair
```

```
1    Business Practices claim, we've alleged the same conduct, the
2    trade secret misappropriation, and the breach of the
3    recruiting provisions, and the tortious interference with
4    contract, all of that falls within unfair business practices,
5    as does the spoliation.
6            THE COURT:  All right.
7            MR. WEIL:  I know Your Honor does not want to hear
8    argument on the spoliation.  I do want to add one fact --
9            THE COURT:  No.  Mr. Weil, I let you present your
10   opening statement.  I've read everything.  I appreciate the
11   points.  I think we've got to move on.
12           MR. WEIL:  May I just say this:  I'm not going to
13   argue the spoliation motion.  I just wanted to cite the Court
14   to one case that is relevant to the summary judgement motions
15   because of the spoliation motion.
16           We cited in our points and authorities
17   United States vs Kitsap, 314 F.3d 995.  It points out that
18   spoliation itself can raise an inference sufficient to deny a
19   summary judgement motion.
20           THE COURT:  All right.
21           MR. WEIL:  There are many cases which stand for the
22   same propostion.  One case which is not cited in our papers,
23   but I at least want to give it to the Court because it's
24   relevant to the summary judgement --
25           THE COURT:  No.  If wasn't cited, I don't want to
```

1    hear about it.

2              MR. WEIL:  All right.  Thank you.

3              THE COURT:  Thank you.

4              MR. MACKEY:  I'm going to be brief.  I will try to

5    refocus the Court on the question and the inquiry that it was

6    making with regard to the fiduciary duty question.  I want to

7    make one comment with respect to Huang, the case that

8    Mr. Weil discussed extensively.  What he didn't point out was

9    that in that case, the defendants were specifically bestowed

10   the duties of managing agents pursuant to contract authorized

11   by that corporation.

12             That makes it different than what we have here

13   where we have junior executives, according to the undisputed

14   evidence, and at-will employees.  Huang does not say what

15   Mr. Weil says it says with respect to the commentary relating

16   to duty of loyalty.  If you read that decision, first you see

17   that it is, in fact, dicta because the Court doesn't move

18   past the finding of managing agents in deference to the prior

19   ruling upon which it was passing.  Secondly, in that case, as

20   the Court specifically defines the elements of the cause of

21   action, it is the same as a breach of fiduciary duty, as the

22   restatement also says.

23             Otherwise, Your Honor, with respect to the

24   unsupported and speculative opening statement, I don't think

25   it would be a great use of our time to rebut every point

1  unless Your Honor has specific questions.  What I would also

2  like to do at some point is to make one or two comments with

3  respect to the confidentiality issues regarding Jay Priday,

4  which Mr. Weil addressed at the very beginning of this

5  process.

6          THE COURT:  Go ahead.

7          MR. MACKEY:  With respect to the fuse sheet, you

8  have to understand a couple of undisputed facts.  The first

9  is the agreement that Mr. Weil read into the record was not

10 drafted by Jay Priday.  It was drafted by Gartner.  It is a

11 classic contract of adhesion.

12         In fact, if you read the first page of that

13 agreement, it goes so far as to say that your agreeing to the

14 specific terms of this document are an absolute, unwavering

15 condition on employment.  They own that language.

16         Now, if you're trying to interpret the language,

17 who do you rely upon but Gartner itself.  We took a

18 deposition pursuant to the 30(b)6.  The person most

19 knowledgeable specifically testified that under that

20 agreement with respect to Mr. Priday, he could not think of

21 anything wrong with Mr. Priday using that fee sheet in his

22 discussion with Mr. Teritera.  (Phonetic).

23         In fact, Mr. Teritera in his testimony -- this is

24 all set forth in the papers.  If you are looking for

25 citations to affirm what the evidence --

1          THE COURT:  What about the second point that it was

2     shared with other folks?

3          MR. MACKEY:  Well, if there was some evidence of

4     that, that would be one thing.  What the evidence is -- if

5     you go back and look at the citations to Mr. Priday's

6     testimony that are cited in the additional facts presented to

7     the Court by the plaintiff, Mr. Priday does not say anything

8     like what he is characterized as saying in that additional

9     fact.  He did not anywhere testify that he disclosed this

10    information to Stradling Yocca or anybody else.  Rather, only

11    that it was contemplated or discussed within Gartner while he

12    was still an employee there.

13          In terms of it being shared, there is simply no

14    evidence of that.  All plaintiff can do is speculate, which,

15    as we all know, is not a proper focus for summary judgement.

16          THE COURT:  Thank you.

17          Next with regard to Stradling Yocca's summary

18    judgement, I do not have any specific questions.  If you want

19    to highlight anything, take a few moments.

20          MR. VALLE:  Thank you, Your Honor.  Jeffrey Valle

21    representing Stradling Yocca.

22          This is the time, Your Honor, where we need to look

23    past rhetoric to the evidence.  There are serious charges of

24    conspiracy and joint venture to engage in wrongful acts.

25    Those charges require evidence.  What we tried to do in our

1    reply was focus the Court on the very, very thin strands that

2    the plaintiff seeks to reply upon.  I'll just touch on them

3    briefly to highlight them.

4            They claim that while our law firm was having

5    discussions with the individual defendants, they were our

6    agent.  That requires a legal right to control them.  It

7    requires that the agent have the right to bind the principal.

8    No evidence of that.

9            They claim that there was a conspiracy to commit

10   wrongful acts; no evidence of that.  They claim a joint

11   venture, a venture to engage in wrongful acts, which is

12   essentially a repeat of their conspiracy.  No evidence of

13   that.

14           What they just reformulate and rehash throughout

15   essentially, two or three things, that Mr. Parikh sent three

16   e-mails unsolicited to Stradling Yocca; that Mr. Kane, an

17   employment lawyer at Stradling Yocca, advised the individuals

18   to comply with the law.  You simply cannot, in my view, infer

19   and let a jury -- go to the jury on an inference that doesn't

20   exist; that telling someone to comply with the law, or

21   receiving three e-mails, which we don't think are trade

22   secrets at all, but certainly, not trade secrets.  There is

23   no evidence that they were solicited, used in any way, shown

24   to anyone.

25           As to the attempt to pivot to claim that there's a

1    direct theory against Stradling Yocca, again, the evidence is

2    completely absent.  There is A, no claim that Stradling

3    interfered with employment contracts.  I've looked in light

4    of Mr. Weil's argument at the complaint again.  The complaint

5    alleges an interference with client contracts, but

6    regardless, there is no evidence of anyone at Stradling Yocca

7    interfering with employment contracts.  There is no evidence

8    of Stradling Yocca interfering with client relationships of

9    Gartner.

10           There is no evidence of Stradling Yocca

11   misappropriating trade secrets.  That's an intentional tort

12   requiring intent.  And even if you obtain trade secrets,

13   you're not violating that law unless you intentionally

14   improperly obtain those secrets.  So to the extent that one

15   even characterizes these e-mails as containing trade secrets,

16   which, again, in the S.G.S. motion, I think that's briefed.

17   I won't repeat the issues there.  There certainly was no

18   solicitation of them and no use of them.

19           Indeed, what is shouting in the room throughout all

20   of the arguments that are made here is that there is no use

21   of any kind to engage in wrongful conduct by anybody here.

22   Certainly, not by Stradling Yocca.

23           THE COURT:  Thank you.

24           Mr. Weil?

25           MR. WEIL:  Your Honor, I think what we attempted to

1   do in our argument is demonstrate two things.  Number one,

2   that Stradling Yocca is liable, and the summary judgement

3   motion has to be denied, because Stradling Yocca has direct

4   liability in addition to vicarious liability for their

5   conduct.

6          Mr. Valle argued in their papers and here today,

7   that Stradling Yocca's position as a shareholder or owner of

8   Stradling Global is sufficient to immunize them from their

9   own tortious conduct.  We've demonstrated that before

10  Stradling Global was even formed, Stradling Yocca was in

11  repeated communications with Mr. Parikh to obtain Gartner's

12  trade secrets.  Mr. Valle says they were all unsolicited and

13  there's no evidence of use.  Both are untrue if you look at

14  the evidence we've submitted.

15         It is not as if Mr. Parikh just threw the documents

16  onto Mr. Gruall, (phonetic) the senior partner at Stradling

17  Yocca.  Mr. Gruall never knew what they were, and it only

18  happened one time.  It happened repeatedly.  It happened for

19  a purpose.  These are very experienced corporate lawyers.

20  We've established that through their deposition testimony.

21  They were deciding whether to invest over $600,000, and the

22  firm's name, and give their office space to a new business

23  that had nothing to do with anything they'd ever done before.

24         In order to make that determination, they had to

25  see what it was that the other defendants were going to bring

to the table.  So the defendants disclosed to them Gartner's

trade secrets to show that they had a valuable sourcing

practice that they could take from Gartner.  It happened not

inadvertently.  It happened repeatedly and it happened for an

improper purpose.

Was the evidence used?  Of course, it was used.  It

was used by Stradling Yocca.  We have unrebutted testimony

that the trade secrets that defendant Parikh sent to

Stradling Yocca were given to their Chief Financial Officer

Mr. Malkoni, who then used them to prepare projections and

budgets for the preparation of this new business.  He used

them to build the business to decide -- to help decide

whether Stradling Yocca should enter into this joint venture

with these other defendants.

The case that they cite for the proposition that

Stradling's position as simply a shareholder immunizes them

is the *PMC Inc., vs. Kadisha* case.  That case held that it's

reversible error to adopt the argument they're proposing.  In

that case you had individuals who joined a business after

trade secrets had been improperly disclosed to that business.

These new individuals became owners of the business.  After

they became owners, the plaintiff then named them as

additional defendants.

The Court held, contrary to what Mr. Valle says

about this being soley an intentional tort, if they knew or

1    should have known that what they were being given were trade

2    secrets that had been misappropriated, then they are equally

3    liable.  Those principles apply here as well.

4          We have demonstrated that Stradling Yocca either

5    knew because they were in their face -- the trade secrets

6    were there before them.  They either knew or should have

7    known that defendant Parikh was misappropriating trade

8    secrets.

9          Now, they argue that the fact that they merely got

10   them is not sufficient.  That's not the tort of

11   misappropriation of trade secrets.  That's wrong.  Because

12   under the Trade Secret statute, there are two ways you can be

13   found liable.  One is misappropriation by acquisition --

14         THE COURT:  This is covered.

15         MR. WEIL:  You've got that.  Then I don't need to

16   cover that, Your Honor.

17         THE COURT:  I've got that.

18         MR. WEIL:  Let me talk a bit about the evidence of

19   conspiracy and what it entailed.  They say that there is no

20   evidence of a conspiracy because they say there is no

21   evidence of a conspiracy.  That's basically it.  They deny

22   the existence of a conspiracy.

23         The evidence of the conspiracy is in what they

24   actually did.  They point to Mr. Cane.  Mr. Cane, who

25   delivered a checklist on October the 26th, the day before the

1    four V.P. defendants resigned without notice.  They point to

2    that as evidence that there was no conspiracy.  That

3    checklist wasn't delivered until after all of the trade

4    secrets had been delivered by Parikh to Stradling Yocca.

5         There's a genuine issue of material fact also as to

6    what Mr. Cane told the V.P. defendants.  Mr. Cane says, I

7    told them they should offer to leave, but not to leave

8    without notice; just offer to leave.  The four V.P.

9    defendants testified that they were instructed by Cane to

10   leave without notice simultaneously.  That in and of itself

11   creates a genuine issue of material fact.

12        We have the conduct of each of these persons acting

13   together to steal Gartner's trade secrets.  That is enough in

14   and of itself to show the conspiracy.

15        THE COURT:  Thank you.

16        The matters will stand submitted.  I'm confident

17   you'll have a ruling by the end of the week.  I can tell you

18   with most certainty that it will be a mixed bag.  Grant in

19   part; denied in part.  The case is ultimately going to go to

20   trial in December, which leads me to the pretrial conference

21   on February -- November 10th, rather.

22        Just briefly, have the parties -- have you had a

23   settlement conference yet?  Where are you at?  What are your

24   future plans?  Are those discussions over?  After the Court

25   rules on summary judgement, are you going to steam roll ahead

1    to trial?

2           MR. WEIL:  Your Honor, we had a mediation before

3    retired Chief Justice Lucas which was unsuccessful.  We're

4    obviously happy to have further discussions following the

5    Court's ruling.

6           MR. MACKEY:  Hope is eternal.  There is still

7    somewhat informal communication going on between the parties.

8           THE COURT:  Once the Court rules, you'll talk about

9    it again.  See what exists; what doesn't exist.

10          Do you intend to go back to retired Justice Lucas

11   or pick somebody else?

12          MR. MACKEY:  I don't know whether at this point we

13   contemplate another formal exercise.  Notwithstanding

14   everything here, we are at least able to speak to each other

15   on the phone without throwing daggers.

16          THE COURT:  Thank you so much.

17          (Whereupon proceedings concluded at 2:47 p.m.)

18

19

20

21

22

23

24

25